UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUTERU KALEOPA,<br><br>                         Petitioner,<br><br>v.<br><br>MARTIN O'MALLEY, Commissioner of Social Security,<br><br>                         Defendant. | Case No.: 24-cv-00363-JO-BLM<br><br>**ORDER GRANTING PETITION FOR JUDICIAL REVIEW AND REMANDING AND REVERSING** |

      Luteru Kaleopa asks this Court to review the denial of his request for social security benefits on account of his disabilities.[1]  Dkt. 14.  Petitioner appeals this denial asserting that the administrative law judge ("ALJ") failed to properly account for the severity of his emotional and behavioral deficits in finding that he was capable of work.  *Id.*  For the reasons provided below, the Court grants Petitioner's request and reverses and remands the ALJ's decision.

---

[1] Petitioner originally applied for benefits on the basis of his purported post-traumatic stress disorder, depression, anxiety, heart failure, gout, and diabetes.  AR 20, 113.

### A. Credibility of Petitioner's Testimony

The Court first considers whether the ALJ incorrectly rejected Petitioner's testimony concerning his anger management issues and consequential inability to interact with others in the workplace.

A finding that a claimant's testimony is not credible "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony [regarding the severity of his symptoms]." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (internal citation omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (internal citation omitted). The ALJ then needs to "link that testimony to particular parts of the record supporting [his] non-credibility determination;" merely "summariz[ing] the medical evidence supporting [the ALJ's] [residual functional capacity] determination" will not suffice. *Id.* at 494; *see also Lambert v. Saul*, 980 F.3d 1266, 1277–78 (9th Cir. 2020) (holding that providing a "detailed overview of the [claimant's] medical history" is not the same as offering clear and convincing *reasons* to discredit testimony). A legal "error is harmless only if it is inconsequential to the ultimate nondisability determination." *See Brown-Hunter*, 806 F.3d at 494 (internal citation omitted).

Here, the ALJ erred in failing to explain how Petitioner's testimony regarding his social limitations and severe anxiety and depression were undermined by the objective medical evidence. Petitioner's testimony largely concerned the abuse he suffered during childhood, his resulting uncontrollable temper and susceptibility to violence, and his fear that his anger management issues will result in an outburst carrying criminal legal consequences as they have before. AR 42–47. In addition, Petitioner attested that he struggles with anxiety and depression daily, stating that he is "scared every day" and must isolate to avoid social conflict. AR 42, 45–46. The ALJ erred by rejecting this testimony wholesale without (1) identifying which specific portions of this testimony lacked credibility and (2) explaining how the medical records undermined those specific portions.

*See* AR 23–24; *Brown-Hunter*, 806 F.3d at 493. Instead, the ALJ generally pointed to signs of Petitioner's positive cognitive functioning, including findings that Petitioner had (1) normal thought processes, normal thought content, and intact memory; (2) adequate concentration; (3) good reasoning and impulse control; (4) fair judgment and fair to good insight; and (5) no internal preoccupation. AR 23. However, these positive indicators predominantly concern Petitioner's baseline cognitive abilities (thought process, memory, concentration, reasoning, and judgment)—not emotional and behavioral issues like Petitioner's susceptibility to violence and criminal actions and his inability to control his temper. *See Brown-Hunter*, 806 F.3d at 494. Nor did the ALJ explain why he believes that Petitioner's positive functioning in one area (cognition) undermines his claims of poor functioning in another (emotional control and social limitations). *See id.* While the ALJ commented that prescribed medications "help [Petitioner] in improving his moods," this does not illuminate why Petitioner's testimony about his emotional and social limitations lacks credibility. AR 23; *see Brown-Hunter*, 806 F.3d at 494. The Court therefore finds that the ALJ did not provide a sufficiently specific reason for doubting Petitioner's credibility.

The ALJ's erroneous rationale for dismissing Petitioner's testimony was not harmless. As a result, the ALJ did not account for Petitioner's purported social and behavioral limitations in his residual functional capacity determination. Instead, the ALJ's residual functional capacity determination stated that Petitioner had the ability to "interact appropriately with co-workers and supervisors," "appropriately respond to supervision," "appropriately respond to . . . changes," and "interact[] with the public."[2] AR 22. Given

---

[2] Specifically, the ALJ found that that Petitioner had the mental ability to:

> understand, remember, carryout, and apply simple tasks and job instructions; interact appropriately with co-workers and supervisors; no teams or collaborative work, but can make appropriate handoffs of work materials and products; occasional non-job duty performance related interaction with the public; appropriately respond to supervision; appropriately respond to routine work settings and changes in routine work

that these findings are not consistent with Petitioner's testimony regarding his volatile temper, inability to cope with stress, and susceptibility to violence, the Court finds that the ALJ's error was not harmless as it may have impacted his ultimate determination that Petitioner was not disabled. *See Brown-Hunter*, 806 F.3d at 494.

Because the Court finds that this error was not harmless, the Court reverses and remands on this ground.

**B. Persuasiveness of Medical Opinions**

The Court next assesses Petitioner's challenges to the ALJ's conclusion that Dr. Solomon's and Dr. Jacobs' opinions were persuasive while Dr. De Silva's opinion was unpersuasive. The Court will first evaluate Petitioner's argument that the ALJ erred in relying on Dr. Solomon's and Dr. Jacobs' opinions when they failed to consider key medical information like his recent mental health records and treating physician's opinion. Then it will address whether the ALJ erred in concluding that Dr. De Silva's opinion was undermined by Petitioner's progress notes.

The "most important factors" the ALJ considers when evaluating the persuasiveness of medical opinions are "supportability" and "consistency." *Woods v. Kijakazi*, 32 F.4th 785, 791 (9th Cir. 2022) (citing 20 C.F.R. § 404.1520c(a)). "Supportability means the extent to which" the underlying medical evidence the doctor relied on supports his conclusions. *Id.* at 791–92 (internal citation omitted); *see* 20 C.F.R. § 404.1520c(c)(1). Importantly, the ALJ must examine whether the opinion is affirmed by the *pertinent* medical evidence; he may not dismiss an opinion that posits a limited residual functional capacity simply because the petitioner showed progress in other irrelevant areas. *See Rule v. Saul*, 859 F. App'x 754, 755 (9th Cir. 2021) (explaining that a medical opinion stating the claimant has serious mental health concerns was not undermined by evidence that the

---

settings and situations; [and] can appropriately ask questions, make decisions, and use judgment.
AR 22.

claimant has normal thought processes, memory, and concentration). "Consistency means the extent to which a medical opinion is consistent" with other medical opinions and objective medical evidence in the record. *Woods*, 32 F.4th at 792 (internal citation omitted); *see* 20 C.F.R. § 404.1520c(c)(2). The ALJ must articulate "how persuasive" he finds "all of the medical opinions" from each doctor or other source and must also "explain how [he] considered the supportability and consistency factors" in reaching his findings. *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(b)). Critically, "an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Id.* at 792. However, even if an ALJ fails to meet these obligations, this legal error is harmless "if it is inconsequential to the ultimate nondisability determination" or if the agency's analysis "may reasonably be discerned." *Brown-Hunter*, 806 F.3d at 494 (internal citation omitted).

**1. Persuasiveness of Dr. Solomon's and Dr. Jacob's Medical Opinions** [3]

The Court will first evaluate whether the ALJ correctly relied on Dr. Solomon's and Dr. Jacobs' opinions that Petitioner was able to perform simple work tasks and engage with others. Petitioner argues that the ALJ erred in doing so because these doctors failed to account for his recent mental health records and treating physician's opinions in reaching their conclusions.

Here, Petitioner correctly notes that neither of these opinions reviewed and accounted for these pertinent elements of Petitioner's medical history. *See* AR 114–15,

---

[3] In addition, Petitioner argues that despite claiming these opinions were persuasive, the ALJ ultimately rejected them because he imposed greater limitations in Petitioner's residual functional capacity. However, an ALJ need not accept all of a physician's suggested limitations in order to find the opinion persuasive. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222–23 (9th Cir. 2010). Moreover, this argument is misguided given that the ALJ's residual functional capacity was more restrictive than the physicians' suggested limitations. *See, e.g., Madison L. v. Kijakazi*, No. 20-CV-06417-TSH, 2021 WL 3885949, at *10–11 (N.D. Cal. Aug. 31, 2021) (rejecting petitioner's argument that "fault[ed] the ALJ for including additional RFC limitations—which actually benefitted her—beyond those assessed by the State agency psychologists" and finding that "the RFC assessment was consistent with the State agency psychologists' findings," but were "simply more restrictive").

134–35. Neither Dr. Solomon's nor Dr. Jacobs's analysis reflect Petitioner's most recent mental health records from San Ysidro Health dating from April 5, 2022, to January 5, 2023, which capture Petitioner's up-to-date issues with anger management, relationship conflict, susceptibility to stress, inability to sustain basic life necessities, and persistent anxiety and depression. *See* AR 930, 938, 942, 956–57, 963–64, 966, 969, 974, 981, 986, 989, 1000, 1003, 1010, 1017, 1025, 1028, 1038. Nor do their findings consider Petitioner's physician's evaluation, in which Dr. De Silva opined that Petitioner's functioning was severely limited and that he was not capable of operating in the workplace. *See* AR 924–29.

The ALJ failed to reckon with the fact that these opinions were not representative of Petitioner's entire medical record and most critically, the most up-to-date mental health findings regarding his ability to interact with others and his constant anxiety and depression. Instead, the ALJ merely stated that these opinions "generally reflect the objectively verifiable mental functional limits arising from the claimant's severe mental impairments." AR 27. Thus, the ALJ never identified (1) what medical evidence Dr. Solomon and Dr. Jacob relied on in coming to their conclusions, (2) the adequacy of that underlying medical evidence, and (3) how such evidence affirms their conclusions. *See Woods*, 32 F.4th at 791–92. Similarly, the ALJ never explained what other evidence or opinions in the record were consistent with these opinions. *See id.* at 792. Nor did he expound on how this evidence mirrored the doctors' opinions. *See id.* Accordingly, the ALJ neither identified what evidence in the record supported their opinions that Petitioner was capable of simple work tasks, limited public contact, interacting with coworkers, and acclimating to the workplace, nor reconciled these opinions with conflicting evidence showing Petitioner's mental health issues and inability to return to the workplace. Had the ALJ grappled with this analysis, he may have reached a different conclusion regarding Petitioner's disability status. His error, therefore, is not harmless. *See Brown-Hunter*, 806 F.3d at 494.

The Court reverses and remands on this ground. *See id.*

## 2. The Persuasiveness of Dr. Nihal De Silva's Medical Opinion

Next, the Court will consider whether the ALJ wrongfully rejected Dr. De Silva's opinion that Petitioner is unable to meet the regular demands of a job. Petitioner argues that the ALJ erred in ruling that Dr. De Silva's opinion was not reflective of Petitioner's medical record.

Here, the ALJ erred in finding that Dr. De Silva's opinion was contravened by the underlying medical evidence. In his report, Dr. De Silva opined that Petitioner was unable to or severely limited in his ability to adequately maintain an ordinary routine, work with others, follow instructions, receive feedback, respond to change, regulate his emotions, handle normal work stress, interact appropriately with the public, and maintain socially appropriate behavior.[4] AR 28, 924–29. The ALJ rejected Dr. De Silva's conclusions on the basis that the underlying medical evidence from San Ysidro Health demonstrated that Petitioner had generally unremarkable mental status examinations, received conservative treatment, and improved with medication. AR 28. However, the ALJ failed to articulate why these medical findings render Dr. De Silva's opinions unsupportable.

Foremost, the ALJ erred because he failed to explain how Petitioner's mental status examinations contradicted and undermined Dr. De Silva's findings about his social and behavioral limitations. Akin to his reasons for finding Petitioner's testimony not credible, the ALJ relied on Petitioner's signs of positive cognitive ability—i.e., his thought processes, memory, concentration, reasoning, and judgment. AR 28. Yet, as highlighted earlier, these positive indicators mostly pertain to Petitioner's executive functioning and

---

[4] Specifically, Dr. De Silva found that Petitioner was unable to compete or function with respect to the following: maintaining regular attendance; sustaining an ordinary routine; working in coordination with or proximity to others; accepting instructions and responding well to criticism; getting along with coworkers or peers; responding appropriately to changes in the work setting; dealing with normal work stress; carrying out detailed instructions; setting realistic goals; making plans independently of others; interacting appropriately with the general public; and maintaining socially appropriate behavior. AR 28. In addition, Dr. De Silva opined that Petitioner had a markedly limited ability to adapt to changes and emotionally regulate and an extremely limited ability to maintain social functioning. *Id.*

not his ability to meet the demands of the workplace, interact with others, and engage with the public. *See Woods*, 32 F.4th at 792. Accordingly, this positive information about cognitive functioning does not contravene Dr. De Silva's conclusion on a different area of functionality—Petitioner's social capacities and ability to cope with stress. *See Rule*, 859 F. App'x 754 (explaining that evidence showing "[claimant's] thought processes, memory, and concentration were within normal limits did not contradict [provider's] conclusions that [claimant] was markedly impaired in her ability to maintain a schedule, communicate with others in a work setting, or plan independently" and "w[as] consistent with [provider's] findings that [claimant] was depressed, anxious, and distractible"); *Isaiah J. B. v. Kijakazi*, No. ED CV 22-01483-AS, 2023 WL 5208812, at *9–10 (C.D. Cal. Aug. 11, 2023) (rejecting ALJ's reasoning that "otherwise normal" mental status examinations contradicted doctor's opinions about behavioral issues).

Moreover, as the ALJ himself noted, the mental status examinations also reflected that Petitioner was consistently anxious and depressed, which actually *affirmed* Dr. De Silva's opinions. Specifically, the ALJ commented that Petitioner's progress notes showed that he regularly exhibited depressive and anxious moods as well as a constricted affect and a general inability to handle stress. AR 28. In particular, this evidence indicated that Petitioner struggled to manage social conflict, suffered from anxiety concerning his health, and was overwhelmed by meeting the basic necessities of everyday life. *See* AR 360, 363, 366, 376, 411, 414, 417, 426, 435, 443, 451, 454, 481, 484, 489, 496, 500, 508, 511, 514, 517, 527, 561, 567, 575, 583, 590, 597, 600, 930, 938, 942, 956–57, 963–64, 966, 969, 974, 981, 986, 989, 1000, 1003, 1010, 1017, 1025, 1028, 1038. Accordingly, the ALJ improperly disregarded Petitioner's consistent mood and affect issues in concluding that he had generally healthy mental status examinations. *See Emily S. v. Kijakazi*, 2023 WL 3805257, at *8 (N.D. Cal. June 1, 2023) (explaining that a claimant cannot have "generally normal findings" where his mental status examinations demonstrate consistent "mood and affect disturbances" in line with his psychiatric diagnoses); *see also Isaiah*, 2023 WL 5208812, at *10 (collecting cases rejecting ALJs' assertions that "normal findings" in

mental status examinations negate a medical opinion regarding disability). As this information supports Dr. De Silva's conclusions, rather than contradicts them, the ALJ erred in finding that Dr. De Silva's opinion was unsupported by these mental status examinations. *See Woods*, 32 F.4th at 791–92.

Lastly, the ALJ's assertion that Petitioner's conservative treatment and improvement with medication undermined Dr. De Silva's opinions is not supported by substantial evidence. *See id*. The ALJ reasoned that Petitioner's conservative treatment and improvement with medication as reflected in Dr. De Silva's progress notes contravened his medical opinion. AR 28. However, the ALJ had no basis upon which to find that Petitioner's medical treatment was "conservative." Rather, given the fact that Petitioner was prescribed four psychiatric medications, including Wellbutrin, Gabapentin, Trazodone and Depakote, in addition to receiving regular psychotherapy, his treatment was significant—*not* conservative. AR 924; *see Carden v. Colvin*, No. CV 13–3856–E, 2014 WL 839111, at *3 (C.D. Cal. March 4, 2014) (collecting cases finding that mental health treatment is not "conservative" "within the meaning of social security jurisprudence" when such treatment involved medications of the sort Petitioner was prescribed here); *see also Baker v. Astrue*, No. ED CV 09–1078 RZ, 2010 WL 682263, at *1 (C.D. Cal. Feb. 24, 2010) ("Where mental activity is involved, administering medications that can alter behavior shows anything but conservative treatment."); *Quiroz v. Berryhill*, No. 8:16-CV-02127-GJS, 2018 WL 922130, at *7 (C.D. Cal. Feb. 14, 2018) ("Nothing in Social Security jurisprudence requires mentally impaired claimants to be subjected to harsh treatments—whether involuntary psychiatric hospitalizations, electroshock, or whatever other non-'routine care' the ALJ apparently believes is necessary to prove that a mentally ill claimant actually suffers [from a disability]."). Second, while the progress notes showed that the medications generally helped improve Petitioner's mood, they also reflected that his anxiety and depression were persistent throughout the years, indicating that these conditions had not meaningfully changed. *See* AR 960–62; *Attmore v. Colvin*, 827 F.3d 872, 877–78 (9th Cir. 2016) (explaining that an ALJ cannot "cherry pick" isolated instances

of medical improvement but must cite examples that constitute "a broader development" in the improvement of the claimant's mental health for this to be a legitimate rationale (internal citation omitted)). Accordingly, and contrary to the ALJ's depictions otherwise, the progress notes were not substantial evidence that Petitioner was receiving conservative treatment and making meaningful progress with the aid of medication. Therefore, the ALJ erred in relying on these as bases to conclude that Dr. De Silva's opinions were unsupported by the underlying medical evidence, including his own progress notes.

Critically, these errors are not harmless given that had the ALJ not disregarded Dr. De Silva's opinion, the ALJ's residual functional capacity determination would have had to account for Petitioner's purported behavioral, social, and workplace related limitations. *See Brown-Hunter*, 806 F.3d at 494. Accordingly, the Court reverses and remands on this ground.

**C. Substantial Evidence**

Lastly, the Court must address whether the ALJ's residual functional capacity determination is supported by substantial evidence. *See Woods*, 32 F.4th at 788. This is because the Court must uphold an ALJ's decision—even where there is legal error—if the ALJ's ultimate conclusion is supported by substantial evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004). Defendant argues that the following evidence establishes that Petitioner had the capacity to engage in simple work tasks and to interact with others and the general public: Petitioner's (1) daily activities, (2) mental status examinations, (3) conservative treatment history, and (4) improvement with medication. The Court has already addressed why Petitioner's mental status examinations, treatment history, and minor improvements do not support the ALJ's conclusion that Petitioner had the capacity to perform these work obligations. The Court will therefore only address whether Petitioner's daily activities supported the ALJ's decision.[5]

---

[5] Of import, the ALJ only discussed Petitioner's daily activities with respect to step 2—whether his impairments meet requirements of 20 C.F.R. Pt. 404, Subpt. P, App. 1—not with respect to the ALJ's

A claimant's daily activities can be grounds for finding that the claimant is more capable of obtaining and maintaining a job than he claims. *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014).  However, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits . . . and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citations omitted).  Accordingly, "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

Here, the Court finds that Petitioner's listed daily activities do not support the ALJ's residual functional capacity determination that Petitioner is capable of (1) interacting and socializing with others and (2) acclimating to the work environment.[6]  AR 21–22. Principally, the ALJ reasoned that although Petitioner had anger management issues— recognizing that he had assaulted a man, been fired for fighting with a coworker, and been incarcerated for three years for fighting— Petitioner's daily activities, such as leaving the house, taking public transportation, attending church, and "get[ting] along" with others, proved that he could engage with others in a work environment.  AR 21.  However, the ALJ did not clarify *how* these daily activities signified that Petitioner had the ability to "interact appropriately with co-workers and supervisors" and face "the public" in a work

---

residual functional capacity determination. *Compare* AR 20–21 *with* AR 23.  However, given that these two analyses are intertwined, the Court evaluates whether Petitioner's daily activities amounted to substantial evidence in support of the ALJ's residual functional capacity determination.

[6] A petitioner's daily activities can also be a reason to find a petitioner's testimony uncredible. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").  As addressed above, the ALJ did not reference this as a reason to discredit Petitioner's testimony. *See* AR 23.  However, as this argument will likely arise again, the Court addresses whether Petitioner's daily activities amount to substantial evidence in support of the ALJ's determination.

setting. AR 22. Second, the ALJ failed to explain how Petitioner's ability to care for his basic needs showed that he could handle the demands of the workplace. The ALJ reasoned that that Petitioner could adapt to change and manage stress because he was able to do his own laundry, cook, clean, dress, bathe, care for his girlfriend and dog, use public transportation, shop, and leave the house. AR 21. Yet, the ALJ did not convey how these activities indicate that Petitioner is capable of "appropriately responding to routine work settings and changes in routine work settings and situations." AR 22. These activities merely demonstrate Petitioner's ability to meet some of his basic needs—not his capacity to respond to change or operate in the work environment. *See Vertigan*, 260 F.3d at 1050. Moreover, the ALJ failed to account for information about Petitioner's daily life that contradicted these conclusions—specifically, Dr. De Silva's treatment notes which indicated that (1) Petitioner's anger management issues impacted his ability to live with his girlfriend, find shelter, and emotionally regulate; and (2) that he struggled to cope with external stressors, such as housing and finances. AR 924–29. As Petitioner's daily activities do not prove his ability to work with coworkers and the public or adapt to the workplace, the Court finds that this evidence does not substantially support the ALJ's residual functional capacity determination. *See Bowen*, 885 F.2d at 603.

In sum, the Court finds that neither Petitioner's daily activities nor his mental status examinations, treatment, or slight improvement amounted to substantial evidence in support of the ALJ's residual functional capacity determination. *Batson*, 359 F.3d at 1197. Because the ALJ's residual functional capacity determination fails to account for the extent of Petitioner's behavioral and mental health issues as reflected by his testimony, the objective medical evidence, and Dr. De Silva's opinion, the Court GRANTS Petitioner's petition for review and REVERSES AND REMANDS.

**IT IS SO ORDERED**.

Dated:  January 8, 2025

_____
Honorable Jinsook Ohta
United States District Judge